UNITED STATES DISTRICT COURT                    ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK

REYNA ELIZABETH ALFARO,

                              Plaintiff,          MEMORANDUM
                                                  AND ORDER
              - versus -                          14-CV-04392

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                              Defendant.

A P P E A R A N C E S :

        DEHAAN BUSSE LLP
                300 Rabro Drive East, Suite 101
                Hauppauge, New York 11788
        By:     John W. DeHaan
                *Attorney for Plaintiff*

        KELLY T. CURRIE
                Acting United States Attorney
                Eastern District of New York
                271 Cadman Plaza East
                Brooklyn, NY 11201
        By:     James R. Cho, Assistant U.S. Attorney
                Gabriel Ascher, Student Intern
                *Attorneys for Defendant*

JOHN GLEESON, United States District Judge:

              Reyna Elizabeth Alfaro seeks review of the Social Security Administration's

("SSA") decision denying her disability benefits.  The parties have cross-moved for judgment on

the pleadings.  Alfaro alleges that she became disabled on June 17, 2011 (her onset date), when

she injured her lower back lifting a heavy box at work.  R. 165-67.  A Social Security

Administrative Law Judge ("ALJ") found that despite her back impairment, Alfaro has been

capable of performing sedentary work with certain restrictions since June 17, 2011, and,

1

therefore, is not disabled.  *Id.* at 26.  Alfaro now argues that the ALJ committed various errors in finding her not disabled and seeks a remand for a new hearing.  For the reasons that follow, the Commissioner's motion for judgment on the pleadings is denied and the case is remanded for further proceedings consistent with this opinion.

## BACKGROUND

Alfaro was born in Honduras in 1974 and immigrated to the United States at the age of eighteen.  *Id.* at 34-35.  She completed schooling only through the tenth grade in Honduras and does not speak, read or write English.  *Id.* at 34-36, 126.  Alfaro is the mother of five children, who at the time of her hearing in 2013 were ages 6, 11, 16, 21 and 23.  *Id.* at 35.

Over the past 15 years, Alfaro has supported herself and her family with a variety of physically taxing, low-skilled jobs, including banquet server, factory packer, housekeeper, restaurant manager and cook.  *Id.* at 36-38, 126.  Because of her limited English language skills, she is limited to working "in places where there's [sic] only Spanish-speaking people."  *Id.* at 35.  The record indicates that beginning in 1998, Alfaro worked at the Marriott International Hotel as a banquet server where she helped set up tables, served food and cleaned. *Id.* at 36-37.  Alfaro had to lift heavy trays of food weighing about 20 to 25 pounds.  *Id.* at 37.  She was then employed as a factory worker at Mid Island Die Cutting and Canvas and Leather Bag.  *Id.*  At these companies, she operated machinery and packed boxes and envelopes.  *Id.* at 37-38.  Her shipping and packing duties required standing and walking for 6 hours per day and lifting up to 20 to 25 pounds.  *Id.* at 37-38, 151.  In 2009, she opened and operated a small restaurant with her sister, where she worked as the manager and cook.  *Id.* at 38-40.  She sold her interest in the restaurant to her sister in 2010, although the paperwork remained in Alfaro's name.  *Id.* at 40.  In 2011, she began working at another factory, Access Direct, in shipping and packing.  *Id.* at  50.

Alfaro also worked as a housekeeper from February 2011 until June 2011, which required standing and walking 4 hours per day and lifting up to 20 pounds.[1]  *Id.* at 150-52.

A.    *Relevant Medical Evidence*

1.    *Treatment History*

On June 17, 2011, Alfaro went to the emergency room at Good Samaritan Hospital for a back injury she sustained when lifting a heavy box at her factory job at Access Direct.  *Id.* at 150, 164.  On examination by Dr. Michelle Gebhard, Alfaro complained of pain in her lower back and there was a spasm in her right lower back.  *Id.* at 165.  Straight leg raising tests were negative on both sides.  *Id.*  Gebhard diagnosed a back strain and prescribed Alfaro Ibuprofen, Percocet, Valium, and Zofran.  *Id.* at 166.

On June 30, 2011, Alfaro visited Dr. Maria Herrera of New York Physical Medicine Services, complaining of lower back pain radiating to her right leg since the work injury.  *Id.* at 244.  On examination of the lumbar spine, Alfaro had flexion to 45 degrees (out of 90), extension to 10 degrees (out of 30), and rotation and lateral bending to 10 degrees (out of 30) bilaterally.  *Id.* at 245.  There were trigger points in the right piriformis muscle,[2] muscle spasms in the right lumbar paraspinal muscles at L2-L5, and tenderness over the paraspinal muscles bilaterally and right piriformis muscle.  *Id.*  Alfaro had decreased sensation in the left lower extremity diffusely.  *Id.*  A straight leg raising test was positive for the right leg and negative for the left leg.  *Id.*  Herrera diagnosed lumbar sprain/strain and sciatica and prescribed

---

[1]    Alfaro's SSA Disability Report notes that she had worked as a housekeeper for Clearview Building Services for a much longer period, from the 1990s until June 2011.  *See* R. 126.

[2]    The piriformis muscle is located in the buttocks near the top of the hip joint, which crosses over the sciatic nerve.  It is an important muscle because it enables us to walk, maintain balance, and shift weight from one foot to another.  Web MD, Piriformis Syndrome, http://www.webmd.com/pain-management/guide/piriformis-syndrome-causes-symptoms-treatments.

Naprelan and Amrix. *Id.* at 245-46. She noted Alfaro's disability status as "temporary total disability." *Id.* at 245.

An x-ray of Alfaro's lumbosacral spine revealed moderate left convex scoliosis of the lower lumber spine and extensive scoliosis involving the right iliac crest abutting the right iliac joint on August 2, 2011.[3] *Id.* at 169. There was no compression fracture or significant degenerative disease. *Id.* The radiologist, however, opined that an MRI may prove useful. *Id.*

On August 22, 2011, Alfaro returned to Dr. Herrera complaining of lower back pain radiating from the right buttock, down the outside of the right leg, and into the foot. *Id.* at 242-43. In the lumbar spine, Alfaro had flexion to 50 degrees (out of 90), extension to 10 degrees (out of 30), and rotation and lateral bending to 10 degrees (out of 30) bilaterally. *Id.* at 242. Alfaro again had mild to moderate spasms in the right lumbar paraspinal muscles at L2-L5. *Id.* A straight leg raising test was positive for the right leg and negative for the left leg. *Id.* Herrera noted that Alfaro had "temporary total disability" and advised her to continue with physical therapy, which she had begun on July 26, 2011. *Id.* at 206, 243. Alfaro was to continue taking Naprolan and Flexeril. *Id.*

A magnetic resonance imaging ("MRI") study performed on September 6, 2011 revealed that Alfaro had slight disc bulging, which was possibly herniated, at the L4-L5 level of the lumbar spine and bilateral mild foraminal narrowing at the L5-S1 level. *Id.* at 170.

On September 23, 2011, Alfaro visited Dr. Herrera. Alfaro's range of motion ("ROM") in the lumbar spine was limited to 30 degrees on flexion and was otherwise unchanged. *Id.* at 240-41. She had decreased sensation in the right lower extremity. *Id.* at 241. Herrera again noted Alfaro's disability status as "temporary total disability" but stated that Alfaro could attempt to return to work on light duty on October 22, 2011. *Id.*

_____

[3] The iliac crest is the long, curved part of the flaring portion of the hip bone (*i.e.*, the ilium).

Electrodiagnostic studies conducted on October 3, 2011 revealed evidence of radiculopathy bilaterally at the L5 level, with signs of re-innervation. *Id.* at 236. Upon review, Dr. Herrera recommended a pain management evaluation to consider lumbar epidural injections. *Id.*

On October 20, 2011, Dr. Herrera examined Alfaro, who complained of increased pain in lifting, bending, and prolonged sitting, standing and walking. *Id.* at 233-34. At this time, Herrera noted that Alfaro had 50 percent whole-person impairment. *Id.* at 233. In the lumbar spine, Alfaro had flexion to 30 degrees (out of 90), extension to 10 degrees (out of 30), and rotation to 10 degrees (out of 30) on both sides. *Id.* Alfaro had muscle spasms in her right lumbar paraspinal muscles. *Id.* A straight leg raising test was positive in the right leg and negative in the left leg. *Id.* Herrera advised Alfaro to restart physical therapy two times per week and prescribed Flexeril although Alfaro said it made her dizzy. *Id.* at 234.

On December 26, 2011, Alfaro once again returned to see Dr. Herrera. *Id.* at 231-32. Alfaro's ROM in the lumbar spine was the same as it had been during the previous examination. *Id.* at 232. She displayed muscle spasms in the right lumbar muscles and had tenderness over the lumbar muscles. *Id.* Herrera advised Alfaro to continue her home exercise program as instructed by her physical therapist and also referred her to a pain management specialist. *Id.* At this time, Herrera noted Alfaro's disability status as "temporary total disability" as a factory worker. *Id.*

In addition to her treatment with Dr. Herrera, the record indicates that Alfaro attended nineteen physical therapy appointments from July 2011 to November 2011 to treat the lower back pain radiating to her right leg. *Id.* at 197-215. At these appointments, Alfaro

underwent a variety of treatments and pain management interventions, including receiving electric stimulation, therapeutic exercises, manual therapy, and hot and cold packs. *Id.*

On January 17, 2012, Alfaro began treatment with Dr. Timothy D. Groth, a pain management doctor, for complaints of stabbing back pain radiating to the right lower extremity. *Id.* at 173. Alfaro told Groth that she had been out of work since her injury and unable to walk any distance due to increasing pain. *Id.* On examination, Alfaro had flexion in her lumbar spine to 10 degrees (out of 30). *Id.* at 174. A straight leg raising test was positive for the right leg. *Id.* Alfaro also had spinal tenderness. *Id.* at 173. Groth recommended a lumbar epidural steroid injection followed by bilateral SI joint injections, which he administered on January 24, 2012 and January 31, 2012. *Id.* at 174, 179, 181. Based on his examination, Groth opined that Alfaro had a disability status of 100 percent. *Id.* at 175.

On January 23, 2012, Alfaro visited Dr. Herrera again to treat the lower back pain that radiated down her right leg. *Id.* at 229-30. Herrera noted that Alfaro had 59 percent whole-person impairment, 96 percent right leg impairment, 50 percent left leg impairment and 19 percent spine impairment based on the most recent lumbar series functional evaluation test performed on November 15, 2011. *Id.* at 229. A straight leg raising test was positive in the right leg and negative in the left leg. *Id.* at 230. Alfaro had muscles spasms and tenderness in the lumbar paraspinal muscles. *Id.* Herrera again prescribed Flexeril and Naproxen and recommended physical therapy and a home exercise program. *Id.* at 229-30.

On July 17, 2012, Dr. Patrick J. Reid, a neurosurgeon, examined Alfaro. *Id.* at 217-18. Reid reported that Alfaro appeared to be in mild discomfort at rest and that she walked with a slow, antalgic gait. *Id.* at 217. A straight leg raising test was positive at 90 degrees in the right leg and Alfaro had tenderness of the paraspinal muscles. *Id.* Reid reviewed Alfaro's MRI

study from September 2011 and noted that there were no significant deformities to account for Alfaro's symptoms, but he arranged for a second MRI to further assess her condition. *Id.* at 218.

On September 14, 2012, Alfaro returned to see Dr. Herrera. *Id.* at 226-28. An examination of the lumbar spine produced the same findings as in January 2012. *Id.* at 227. However, straight leg raising tests were now positive on *both* sides. *Id.* Alfaro had muscle spasms and tenderness in the lumbar paraspinal muscles. *Id.* Herrera added herniated disc and lumbar radiculopathy to the previous diagnoses of lumbar sprain/strain and sciatica. *Id.* She opined that Alfaro had moderate partial disability and recommended lifting no more than fifteen pounds, standing or sitting for no more than one continuous hour and no frequent bending. *Id.* at 228.

On October 11, 2012, Alfaro visited Dr. Reid again. *Id.* at 216. Alfaro told Reid that she had not obtained the second MRI because her workers compensation insurance did not cover it, but that she would arrange for one under her own insurance. *Id.* Reid examined Alfaro and again reported that she was in mild discomfort while at rest and walked with a slow, antalgic gait bearing more weight on the left side. *Id.* A straight leg raising test was positive at 90 degrees on the left and 80 degrees on the right leg. *Id.*

Alfaro returned to Dr. Groth on January 2, 2013, at which time he assessed her as 100 percent disabled. *Id.* at 221. Groth's medical notes of his examination refer to a "recent MRI" and bear the notation "too much damage for corrective surgery." *Id.* The recent MRI is missing from the administrative record.

On February 8, 2013, Alfaro visited Dr. Herrera. *Id.* at 224-25. Alfaro had muscle spasms and tenderness in the lumbar paraspinal muscles. *Id.* at 224. Straight leg testing was positive in both legs with decreased sensation in the right lower extremity. *Id.* Herrera

stated that Alfaro had a moderate partial disability of 50 percent and recommended lifting no more than fifteen pounds, standing or sitting for no more than one continuous hour and no frequent bending.  *Id.* at 224-25.

On February 12, 2013 and March 17, 2013, Dr. Groth examined Alfaro and found that she was 50 percent disabled.  *Id.* at 219-20.

In a medical assessment dated April 17, 2013, Dr. Herrera opined that Alfaro could lift and/or carry up to 15 pounds occasionally and 7 pounds frequently.  *Id.* at 247. Herrera stated that Alfaro could walk or stand for a total of three hours and sit for a total of five hours in an eight-hour workday, yet could do neither for more than one hour without interruption.  *Id.* at 248.  Herrera further stated that Alfaro should never climb, stoop, kneel, balance, crouch or crawl, and that reaching, pushing and pulling could aggravate her symptoms.  *Id*.  Herrera based her opinion on the physical examination findings, MRI, EMG and functional evaluation test results.  *Id*.

On April 22, 2013, Dr. Herrera examined Alfaro, who continued to complain of lower back pain radiating to the right leg.  *Id.* at 222.  An examination of the lumbar spine produced similar findings as the previous appointment as well as additional findings of lumbar sprain/strain, HNP, lumbar radiculopathy, and sciatica pain exacerbation.  *Id*.  Herrera noted that Alfaro had a moderate partial disability of 50 percent and noted the same limitations as the previous appointment (no lifting of more than fifteen pounds, no standing or sitting for more than one hour continuously and no frequent bending).  *Id.* at 223.

2.    *Consultative Examination*

On May 16, 2012, Dr. Erlinda Austria performed an internal medicine consultative examination of Alfaro on behalf of the SSA.  *Id.* at 183-86.  Alfaro reported that she

had previously had surgery on her right shoulder after being involved in a motor vehicle accident in 2006. *Id.* at 183. She reported that she suffered from constant lower back and right shoulder pain. *Id.* She told Austria that she helped her family with the cooking, cleaning, laundry and shopping. *Id.* at 184. Alfaro could take care of her personal grooming and hygiene, and watched television, listened to the radio and socialized with friends. *Id.* Austria diagnosed injuries to the right shoulder and lower back, which had been sustained while Alfaro was working at the factory. She opined that Alfaro had a mild restriction with regard to activities involving the right shoulder but no restriction regarding the rest of the upper extremities; a mild restriction squatting, bending, prolonged sitting, standing, and walking; and a mild restriction in activities involving the right hip and right knee. *Id.* at 185. Austria stated that Alfaro would need the recent radiologic studies including the MRI to confirm her findings. *Id.*

B.    *Procedural History*

Alfaro filed her claim on February 6, 2012, alleging a disability onset date of June 17, 2011. *Id.* at 109-10. Her claim was denied initially on May 31, 2012. *Id.* at 55. On June 7, 2012, she requested a hearing, which was held before the ALJ on May 20, 2013. *Id.* at 30-54. At the hearing, Alfaro was accompanied by her attorney and testified with the aid of a translator. *Id.* at 32-49. The ALJ denied Alfaro's claim on May 31, 2013. *Id.* at 19-26. Alfaro requested Appeals Council review on June 17, 2013. *Id.* at 14. On May 23, 2014, the council denied review, making the ALJ's decision the final action of the Commissioner. *Id.* at 1-6.

DISCUSSION

A.    *The Legal Standards*

A claimant seeking disability insurance benefits must establish that, "by reason of any medically determinable physical or mental impairment which . . . has lasted or can be

expected to last for a continuous period of not less than twelve months," 42 U.S.C. §

1382c(a)(3)(A), she is not only unable to perform her previous work, but cannot engage in any

other kind of substantial gainful work that exists in the national economy taking into account her

age, education and work experience. *Id.* § 1382c(a)(3)(B).

The SSA's regulations prescribe a sequential five-step analysis for determining

whether a claimant is disabled:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity. If he is not, the
> [Commissioner] next considers whether the claimant has a severe
> impairment which significantly limits his physical or mental ability
> to do basic work activities. If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed in
> Appendix 1 of the regulations. If the claimant has such an
> impairment, the [Commissioner] will consider him disabled
> without considering vocational factors such as age, education, and
> work experience; the [Commissioner] presumes that a claimant
> who is afflicted with a listed impairment is unable to perform
> substantial gainful activity. Assuming the claimant does not have a
> listed impairment, the fourth inquiry is whether, despite the
> claimant's severe impairment, he has the residual functional
> capacity to perform his past work. Finally, if the claimant is unable
> to perform his past work, the [Commissioner] then determines
> whether there is other work which the claimant could perform.

*DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998) (internal quotations omitted)

(quoting *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir. 1982)); *see also* 20 C.F.R. §

404.1520(a)(4)(i)-(v) (setting forth this process). The claimant bears the burden of proof in the

first four steps, the Commissioner in the last. *See Green-Younger v. Barnhart*, 335 F.3d 99, 106

(2d Cir. 2003) (citation omitted); 68 Fed. Reg. 51153 (Aug. 26, 2003).

The Commissioner decides whether the claimant is disabled within the meaning

of the Social Security Act ("the Act"). 20 C.F.R. § 404.1527(d)(1). Under 42 U.S.C. § 405(g), I

review the Commissioner's decision to determine whether the decision is supported by

substantial evidence, and whether the correct legal standards were applied. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). If the record contains evidence which "a reasonable mind might accept as adequate to support [the Commissioner's] conclusion," this Court may not "substitute its own judgment for that of the [Commissioner] even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (quotation marks omitted).

The district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004) (citations omitted). A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).

B.      *The ALJ's Rejection of Alfaro's Disability Claim*

The ALJ followed the five-step procedure outlined above for determining whether Alfaro was disabled within the meaning of the Act. At the first step, the ALJ found that Alfaro had not engaged in substantial gainful activity since her alleged onset date of June 17, 2011. R. 21. At step two, the ALJ found that Alfaro's lumbar degenerative disc disease constituted a "severe" impairment, which "causes more than minimal limitations in [Alfaro's] ability to

perform basic work activities." *Id*. At step three, the ALJ found that these impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. § 404 Subpart P, App.1 because "the requisite criteria for the relevant listings are absent from the medical records" and "no treating or examining physician has indicated findings that would satisfy the requirements of any listed impairment." *Id*. at 22.

The ALJ then found that Alfaro had the RFC to perform sedentary work as defined in 20 CFR § 404.1567(a), with the exceptions that she required a break of less than five minutes each hour to stretch, and could never stoop, kneel, crouch or crawl. R. 22. In making the RFC assessment, the ALJ relied on the "consultative examination and the limited treatment record." *Id*. at 24. Dr. Herrera's medical opinion was accorded "limited weight" and the ALJ did not state what weight, if any, she accorded Dr. Groth's or Dr. Reid's medical opinions. *Id*. at 23-24. Dr. Austria's medical opinion was accorded "considerable weight." *Id*. at 24.

At step four, the ALJ found that Alfaro was unable to perform her any of her past relevant work. *Id*. at 25. The ALJ stated that she did not find Alfaro credible based on "the reasons explained in the decision[,]" because "although [Alfaro] does not speak English, she has been living in the United States for 20 years[,]" and because of her employment history and her reported daily activities. *Id*. at 24. At step five, the ALJ found that Alfaro was not disabled. Her determination was based on Alfaro's RFC, vocational profile and the vocational expert's testimony. *Id*. at 25-26**.**

C.      *Analysis of the ALJ's Disability Determination*

1.      *The Treating Physician Rule and the Duty to Develop the Record*

Under the treating physician rule, the opinion of a treating physician is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory

diagnostic techniques," and not inconsistent with other substantial evidence in the record.  20

C.F.R. §§ 404.1527(c) and 416.927(c); *see, e.g.*, *Halloran v. Barnhart*, 362 F.3d 28, 31–32 (2d

Cir. 2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (treating physician's opinion not

controlling when contradicted "by other substantial evidence in the record").  The treating

physician rule "dovetails with the ALJ's affirmative duty to develop the record."  *Ocasio v.

Colvin*, No. 12-CV-6002 (JG), 2013 WL 1395846, at *9 (E.D.N.Y. Apr. 5, 2013) (*citing Tejada

v. Apfel*, 197 F.3d 770, 774 (2d Cir. 1999)).  The non-adversarial nature of a Social Security

hearing requires the ALJ "to investigate the facts and develop the arguments both for and against

granting benefits[.]"  *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) (citation omitted).  Because of

the treating physician rule, the ALJ's duty to "develop the record is particularly important when

it comes to obtaining information from a claimant's treating physician."  *Devora v.

Barnhart*, 205 F. Supp. 2d 164, 172-73 (S.D.N.Y.  2002).  This obligation includes obtaining the

treating physicians' assessments of the claimant's RFC.  *Lawler v. Astrue*, No. 10-CV-3397

(ARR), 2011 WL 5825781, at *7 (E.D.N.Y. Nov. 14, 2011) ("An ALJ's affirmative obligation to

develop the record also includes the obligation to contact a claimant's treating physicians and

obtain their opinions regarding the claimant's residual functional capacity .").

   In this case, the ALJ did not fulfill her obligation to develop the record or give the

treating physicians' opinions controlling weight.  Turning first to the failure to develop the

record, the ALJ had an affirmative duty to request the MRI that Dr. Groth discussed his January

2, 2013 examination notes.  Specifically, Groth's notes refer to a "recent MRI" followed by the

notation stating "too much damage for corrective surgery."  R. 221.  While the record includes a

September 2011 MRI, *id.* at 170, Groth appears to discuss a more recent MRI.  *See id.* at 221.

That another MRI (one that is not included in the record) exists is supported by Dr. Reid's

evaluation notes from July 17, 2012, which states that he has arranged for a second MRI. *Id.* at 218. This gap could be significant if the MRI indeed indicated that Alfaro's injuries were too severe for corrective surgery. In addition, it is likely that evidence from the MRI relates directly to Alfaro's treating physicians' opinions. *See Soto v. Comm'r of Soc. Sec.*, No. 09-CV-00457 (SLT)(RER), 2010 WL 4365528, at *8-9 (E.D.N.Y. Oct. 1, 2010) (an ALJ's duty to develop gaps in the administrative record is especially important when the missing records relate to a treating physician's opinion); *see also Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) ("[T]he ALJ was required to develop [the claimant's] complete medical history for at least a twelve-month period if there was reason to believe that the information was necessary to reach a decision.").[4]

The ALJ also failed to obtain the necessary medical records in that she did not request a proper assessment of Alfaro's RFC from Dr. Groth. *See* 20 C.F.R. § 404.1513(b)(6) (describing "medical reports" as including "statements about what [a claimant] can still do"). "Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." *Hilsford v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010) (citing *Woodford v. Apfel,* 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000) ("An ALJ commits legal error when he makes a residual functional capacity determination based on medical reports that do not specifically explain the scope of claimant's work-related capabilities.")). While Groth provided a disability status, R. 219-22, he did not provide an opinion of Alfaro's functional abilities during the relevant period, which the ALJ was required to obtain before making her own RFC determination. *See Zorilla v.*

---

[4]        The government concedes that the ALJ could have inquired about this MRI. Hearing Transcript ("Tr.") at 18, ECF No. 21.

*Chater*, 915 F. Supp. 662, 666–67 (S.D.N.Y. 1996) ("The lay evaluation of an ALJ is not sufficient evidence of the claimant's work capacity; an explanation of the claimant's functional capacity from a doctor is required.").

Despite these gaps in the record, the ALJ improperly proceeded to accord Dr. Herrera's opinion limited weight and Dr. Groth's opinion no weight. *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) ("an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record"). First, the ALJ dismissed Herrera's opinion that Alfaro could sit only for 5 hours and stand/walk for 3 hours in an 8-hour day and lift/carry up to 15 pounds, *see* R. 248, because the ALJ determined that Herrera's opinion was "only partially consistent with the clinical signs and diagnostic tests[.]" *Id.* at 23. The ALJ also found Herrera's opinion inconsistent with Alfaro's testimony of her daily activities (*e.g.*, driving, cooking, cleaning, getting her children ready for school) and that Herrera's April 22, 2013 treatment note was not "necessarily consistent" with an opinion offered on April 17, 2013. *Id.* at 23. However, reference to parts of the record that were *not necessarily* consistent or only *partially* inconsistent with Herrera's opinion, without considering the parts that *were* consistent, or parts that were missing and may have been consistent, did not provide a sufficient basis for according Herrera's opinion, as a treating physician, limited weight.

Moreover, the ALJ had an obligation to consider the various factors set forth in 20 C.F.R. §404.1527(d)(2) to determine how much weight to give Dr. Herrera's opinion as the treating physician before according it "limited weight." *See Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (upholding regulations because they "give deference to the opinions of treating physicians based on the view that opinions based on a patient-physician relationship are more reliable than opinions based, say, solely on an examination for purposes of the disability

proceedings themselves.").  These factors include: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion."  *Halloran*, 362 F.3d at 32.  However, the ALJ did not appear to consider Herrera's treatment relationship with Alfaro, or evidence that was consistent with Herrera's opinion.

The frequency, length, nature, and extent of Dr. Herrera's treatment relationship with Alfaro was significant: it began only two weeks after Alfaro sustained her injury and Herrera continued to examine and treat Alfaro every four to six weeks for nearly two years, up until the time of the ALJ's hearing.  R. 244, 247.  Given the extent of Herrera's treatment relationship, she is the "the medical professional[] most able to provide a detailed, longitudinal picture of [Alfaro's] medical impairment(s) and [...] bring[s] a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative examinations."  20 C.F.R. § 404.1527(d)(2).  Herrera's opinion was also supported by record evidence: Herrera's treatment records over two years document both the severity and progression of Alfaro's condition during the course of her treatment.  For example, Herrera observed a positive straight leg raising test on the right during every one of her examinations of Alfaro.  R. 222-46.  Then, beginning with the September 26, 2012 office visit, Herrera noted a positive straight leg raising test on both sides.  *Id.* at 222-28.  Likewise, Herrera reported impaired and deteriorating lumbar ROM during each office visit.  *Id.* at 222-46.

Dr. Herrera's assessment is also consistent with the diagnostic testing. For example, the lumbosacral x-ray of August 2, 2011 showed extensive sclerosis on the iliac side of the right S1 joint and moderate scoliosis. *Id.* at 169. The September 6, 2011 lumbar spine MRI showed a bulging, possibly herniated, disc at L4-L5 mildly compressing the dural sac and mild stenosis. *Id.* at 170. The October 3, 2011 EMG was positive for bilateral L5 lumbar radiculopathy. *Id.* at 235-36. Multiple lumbar series functional evaluation tests performed by Central Broadway Medical found functional deficits in static lifting, ROM of the spine and lower extremities, and right leg muscle strength. *Id.* at 229, 231, 233.

Dr. Herrera's opinion is also consistent with Dr. Groth's findings. For example, on January 17, 2012, Groth also noted impaired lumbar ROM, spinal tenderness, and positive straight leg raising test on the right. *Id.* at 174. He agreed that Alfaro suffers from lumbar radiculopathy, as well as sacroiliitis. *Id.* Groth also agreed that Alfaro could not work. *Id.* at 221. And while the ALJ accorded only limited weight to Herrera's opinion, she does not appear to have accorded Groth's opinion any weight whatsoever. *See id.* at 23-24.

While the Commissioner correctly points out that a "slavish recitation of each and every factor" by the ALJ is not required, this is only so "where the ALJ's reasoning and adherence to the regulation are clear." *See Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (citing *Halloran*, 362 F.3d at 31-32). The ALJ's reasoning in according Dr. Herrera's opinion limited weight here is not clear given the volume of evidence consistent with Herrera's opinion. And the ALJ's obligation to consider the factors set forth in § 404.1527(d)(2) applied to Dr. Groth as well. Yet the ALJ offered no reasoning as to what weight, if any, she accorded Groth's opinion.

While the ALJ failed to accord significant weight to Alfaro's treating physicians' opinions, she gave "considerable weight" to the opinion of the consulting physician, Dr. Austria, who examined Alfaro on only one occasion and whose opinion should have been accorded limited weight. *See Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990) (a consulting physician's opinion should be given limited weight because consultative exams are often brief, are generally performed without reviewing the claimant's medical history, and offer only a glimpse of the claimant on a single day). First, Austria's opinion provided only vague descriptions of Alfaro's condition such as a "mild restriction for activities involving the right shoulder" and "a mild restriction to squatting" and "limited range motion." R. 185. Such vague statements are insufficient for determining a claimant's RFC. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (finding a physician's opinion that "plaintiff's impairment is: lifting and carrying moderate; standing and walking, pushing and pulling and sitting mild" so vague as to render it useless in evaluating the claimant's RFC). Second, the ALJ failed to adequately develop the record because Austria has stated that she needed the radiologic studies and MRI to confirm her findings, implying that her brief examination of Alfaro alone was insufficient to support her findings. R. 185. Yet the ALJ accorded Austria's opinion considerable weight, and discounted the treating physicians' opinions despite the significant record evidence in support.

Lastly, Alfaro's description of her daily activities cannot be fairly characterized as inconsistent with Dr. Herrera's opinion. Herrera opined that Alfaro could sit for 5 hours, stand/walk for 3 hours in an 8-hour day, and lift/carry up to 15 pounds. These limitations would not restrict Alfaro from driving, or cooking, or picking up her children from school because none of these activities require sitting for 5 hours, or standing or walking for 3 hours, or lifting up to 15 pounds.

2.      *The ALJ's Evaluation of Alfaro's Credibility*

"It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Secretary, Dep't of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (citation and quotation omitted). To assess a claimant's credibility, the ALJ must proceed under the two-step process set out in 20 C.F.R. § 404.1529. First, the ALJ must evaluate if the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established. *Id.* Then, the ALJ must evaluate how the symptoms of that "medically determinable physical or mental impairment" affect the claimant's ability to work. 20 C.F.R. § 404.1529(c). Although the ALJ found that Alfaro's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," she nevertheless found Alfaro's statements about the intensity, persistence, and limiting effects of these symptoms were "not entirely credible[.]" R. 24.

In assessing Alfaro's credibility, ALJ noted that Alfaro does not speak English although she had been living in the United States for 20 years. *Id.* The ALJ then noted that Alfaro was scheduled to take her citizenship exam in English that same month. *Id.* It is not entirely clear how the ALJ interpreted these facts to bear on Alfaro's credibility. Alfaro's ability to speak English, and whether she is a citizen or taking a citizenship exam in English, have no bearing on her ability to work. Having determined that Alfaro's impairments could reasonably be expected to cause Alfaro's symptoms, the ALJ's inquiry should have focused next on how her claimed symptoms affected her ability to work as required under § 404.1529(c) – not how well she spoke English.

The ALJ also took issue with a perceived inconsistency in Alfaro's employment record. Specifically, Alfaro claimed that she had sold her interest in the restaurant she co-owned to her sister in 2010, but her tax records showed $6,000 income from the restaurant for 2012. *See id.* at 24. However, Alfaro had explained this discrepancy at the hearing: although she had sold her interest to her sister, the paperwork remained in her name, and presumably the taxes were filed in her name for this reason. *Id.* at 40-41.

Lastly, the ALJ erred by improperly relying on Alfaro's daily activities in finding her not credible. An ALJ can properly rely on evidence of a claimant's daily activities in order to assess how medical conditions affect a person's experience. *See* 20 C.F.R. § 416.929(a) (listing "daily activities" as a factor used to evaluate reported symptoms). But the ability to perform basic life activities is not necessarily inconsistent with a claim for disability. *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). Here, the ALJ found that Alfaro takes care of her younger children, spends time with her family, drives, does laundry and other chores. But there is no evidence that Alfaro "engaged in any of these activities for sustained periods comparable to those required to hold a sedentary job." *Id.* In sum, while it was not unreasonable for the ALJ to consider Alfaro's daily activities in assessing her ability to work, the ALJ erred in concluding that evidence of carrying on basic activities that do not require continuous sitting or standing showed Alfaro could meet the requirements of sedentary work. *Id.* ("a claimant need not be an invalid to be found disabled under the Social Security Act").

CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied, and Alfaro's motion to remand for a new hearing consistent with this opinion before a different ALJ is granted. Under 20 C.F.R. § 404.940, "remand to a new ALJ is

necessary in those situations which compromise" the integrity of the disability review process.

*Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 292 (E.D.N.Y. 2004) (internal citations omitted).

"Specifically, when the conduct of an ALJ gives rise to serious concerns about the fundamental fairness of the disability review process, remand to a new ALJ is appropriate." *Id.* Factors I may consider in making this determination include: (1) a clear indication that the ALJ will not apply the appropriate legal standard on remand; (2) a clearly manifested bias or inappropriate hostility toward any party; (3) a clearly apparent refusal to consider portions of the testimony or evidence favorable to a party, due to apparent hostility to that party; or (4) a refusal to weigh or consider evidence with impartiality, due to apparent hostility to any party. *Id.* Applying these factors to this case, I conclude that the case should be assigned to a different ALJ on remand.

So ordered.

John Gleeson, U.S.D.J.

Dated:
     July 29, 2015
     Brooklyn, New York